**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**"LNU" Omar a/k/a Fernandez, Omar,**
**Defendant–Appellant.**

**No. 91–5414.**

United States Court of Appeals,
Eleventh Circuit.

March 23, 1994.

Carl Lida, Miami, FL, for defendant-appellant.

Dexter Lehtinen, U.S. Atty., William C. Healy, Linda Collins Hertz, Dawn Bowen, Miami, FL, for plaintiff-appellee.

Before EDMONDSON and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.

PER CURIAM:

Defendant/Appellant Omar Fernandez appeals the district court's application of the United States Sentencing Guidelines (U.S.S.G.) to his conviction for armed bank robbery.

I

In the early afternoon of June 22, 1990, Fernandez and three confederates, Cassandra Cassidy, Francisco Barrera–Martinez, and Raymundo Torres, robbed the Citizens Federal Bank in Miami Beach, Florida. While Cassidy waited in a getaway car, the three men entered Citizens Federal. Fernandez, armed with a handgun, vaulted the teller counter while Barrera–Martinez and Torres, armed with a second handgun and an Uzi machine pistol, held the occupants of the bank at bay. Fernandez pointed the gun at the head of the bank's assistant manager and said "You have three seconds to open the vault." The assistant manager opened the vault.

Fernandez removed two strong boxes containing $31,231.50, jumped back over the counter and said "You can now go on with your business." The three men fled to the getaway car and placed the money and their weapons in the trunk. Cassidy drove off and the men fled to the beach where Torres was apprehended by a Miami Beach police officer.

Fernandez subsequently pleaded guilty to three counts of armed bank robbery, two counts relating to earlier robberies in the Miami area. At sentencing in May of 1991, the parties agreed on a base offense level of 30 and a criminal history category of II under the Sentencing Guidelines. Over Fernandez' objection, the district court departed upward from the base offense level, a total of three levels. At the sentencing hearing, the district judge commented that extensive planning had gone into the crime and pointed out that Fernandez had supplied the weapons and had displayed what the court considered a cavalier attitude during the offense. The judge found that Fernandez had made an express death threat to the bank's assistant manager and that Fernandez had endangered public safety as well as the safety of the bank employees by robbing the bank during business hours. The court relied on these two findings, on the use of multiple weapons, and possibly on other circumstances as well, as bases for departure.

The court's departure left Fernandez with an offense level of 33, under which he was sentenced to 165 months imprisonment. Fernandez filed this appeal, arguing that the departure was impermissible under the Sentencing Guidelines.

II

We review departures from the Sentencing Guidelines in three steps. First, we determine whether the guidelines adequately consider a particular factor and therefore preclude a sentencing court from using it as a basis for departure. *United States v. Weaver,* 920 F.2d 1570, 1573 (11th Cir.1991);

*see also* 18 U.S.C. § 3742(e)(3) (1988). Second, if we find that the factor is not adequately reflected in the applicable guideline and adjustments, we determine whether there is sufficient factual support for the district court's departure. *Weaver*, 920 F.2d at 1573. Third, if we are satisfied that a basis for departure exists and is supported by the record, we weigh the reasonableness of the departure. *Id.* We assess reasonableness as instructed by 18 U.S.C. § 3742(e)(3)(A) & (B) "having regard for the factors to be considered in imposing a sentence ... and the reasons for the imposition of the particular sentence [ ] as stated by the district court." *Id.*

■ Fernandez' base offense level was calculated under U.S.S.G. § 2B3.1, Robbery (Nov. 1990). At the time appropriate to this case, this section set a base offense level of 20 for robbery, § 2B3.1(a), and provided increases for specific offense characteristics such as the nature of the institution robbed, § 2B3.1(b)(1), weapons used, § 2B3.1(b)(2), injury to or abduction of victims, § 2B3.1(b)(3) & (4), and amount taken, § 2B3.1(b)(6). Under § 2B3.1, Fernandez received specific offense increases for robbery of a financial institution (2 levels), for a dangerous weapon "otherwise used" (4 levels), and for loss to the bank between $10,000 and $50,000 (1 level). Under separate sections of the guidelines, he received additional increases for an aggravating role in the offense (2 levels) and for the multiple counts of conviction (3 levels), and was awarded a two level downward departure for acceptance of responsibility.

The three circumstances found by the district court to warrant upward departure from this offense calculation were (1) the use of multiple firearms in the offense, (2) the express threat of death to the bank's assistant manager, and (3) the danger to the public created by commission of the robbery during business hours. Our first task is to determine whether these factors were already adequately reflected in Fernandez' base offense level such that the departure constituted double counting. *See Weaver*, 920 F.2d at 1573.

The text and comprehensive structure of § 2B3.1 suggest that the Commission did consider these factors as elements common to robbery. First, subsection (b)(2), which deals with weapon use, provided:

(A) If a firearm was discharged, increase by 5 levels; (B) if a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels; (C) if a dangerous weapon (including a firearm) was brandished, displayed, or possessed, increase by 3 levels; or (D) if an express threat of death was made, increase by 2 levels.

United States Sentencing Commission, *Guidelines Manual*, § 2B3.1(b)(2) (Nov. 1990). While the number of weapons used in an offense is not expressly a part of this pyramid of increases, the detailed structure of the guideline suggests that the absence of an increase for the number of weapons is a result of design rather than inadvertence. The Sentencing Commission may well have concluded that the number of weapons involved in a robbery was not a primary factor in pre-guidelines sentencing practice, or that a sentence calculated with reference to the factors ultimately included in the guideline would adequately punish multiple defendants' use of multiple weapons. The Commission also made available an alternative calculation for the use of firearms in relation to certain crimes under § 2K2.4 and left sentencing authorities with discretion to depart from the guideline sentence in cases involving excessive numbers or atypical uses of weapons. In any event, we need not determine precisely why the Commission did not choose multiple weapon use as a specific offense characteristic of robbery; we need only decide whether the Commission considered it in drafting § 2B3.1. We believe that it did so.

We next conclude that Fernandez' threat to the assistant manager was offense conduct considered by the Sentencing Commission and incorporated into his base offense level through § 2B3.1(b)(2). An express threat of death without the possession, brandishing or other use of a weapon, receives the lowest, two level, increase in the pyramid of offense conduct in § 2B3.1(b)(2). Each step above that, from brandishing, displaying, or possessing a weapon, up to discharging a fire-

arm, incorporates at least an implicit threat of death. The section offers a set of alternative increases such that a sentence like the one given Fernandez, which includes an increase for one of the uses of a firearm or a dangerous weapon, should not include an independent increase, whether by departure or otherwise, for an express threat of death. *See United States v. Farrier,* 948 F.2d 1125, 1127 (9th Cir.1991) (holding that a single offense supports only a single increase under § 2B3.1(b)(2)). The incorporation of express threats into the weapons section demonstrates that the Sentencing Commission considered this factor in drafting the robbery guideline.

We are equally satisfied that danger to the public was an aspect of robbery considered by the Sentencing Commission. The offensive use of a dangerous weapon in the robbery of a financial institution commonly creates a danger to the public. Section 2B3.1 incorporates punishment for the creation of such a hazard through specific offense increases for the nature of the institution robbed, specific uses of weapons, and injury or threat to victims.

At issue is not whether we approve or disapprove of the choices made by the Sentencing Commission in drafting the robbery guideline; at this stage, we review the guidelines asking only whether the Commission *considered* particular aspects of an offense. We are satisfied that it did consider all the factors used by the district court as bases for departure. We must now decide whether those factors, as they exist in this case, were *adequately* considered in the guidelines.

### III

█ The fact that the Sentencing Commission considered a factor in drafting a particular guideline indicates that the factor is usually an inappropriate basis for a departure. *Weaver,* 920 F.2d at 1573. However, where a case has unusual aggravating or mitigating circumstances, such circumstances may warrant a departure even though the Sentencing Commission incorporated the general offense conduct the applicable guideline. As this Court said in *Weaver,* when a particular factor has been considered in drafting a guideline, "we must focus on whether the guideline *adequately* takes these factors into account." *Id.* at 1574 (emphasis in original). The guidelines provide the sentencing court with power to depart where a strict guideline sentence would not adequately reflect the particular nature of the defendant's conduct, but they caution that courts should use this power sparingly where offense conduct is already reflected in the applicable guideline and adjustments. Where a particular aspect of an offense is incorporated in the underlying offense guideline, "departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense." U.S.S.G. § 5K2.0, p.s. In words which we have adopted from the Sixth Circuit, " 'only cases outside the heartland for the crime of conviction warrant departure.' " *United States v. Mogel,* 956 F.2d 1555, 1564 (11th Cir.), quoting *United States v. Brewer,* 899 F.2d 503, 507 (6th Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), *cert. denied* —— U.S. ——, 113 S.Ct. 167, 121 L.Ed.2d 115 (1992); *see also* U.S.S.G. Ch. 1, Pt. A, intro. comment. 4(b), p.s. (stating that guidelines cover "heartland" of typical cases so courts depart only in "atypical" cases "where conduct significantly differs from the norm").

The district court employed a shotgun approach in discussing its reasons for departing upward in this case, mentioning the fact that multiple robbers and weapons were involved, but also mentioning that the robbery was planned days in advance; it was committed during daylight hours when members of the public were present; the robbers displayed a cavalier attitude (One of them stated at the conclusion of the robbery: "You can now go on with your business."); a threat was made to the assistant manager; and, there was a get away "up to the east coast." We are convinced that none of those factors justify an "outside the heartland" upward departure under § 5K2.0, except for the multiple robbers and multiple weapons factors.

In the typical bank robbery, there is one robber who, as often as not, is unarmed. *See* Federal Bureau of Investigation, Department of Justice, Bank Crime Statistics: Federally Insured Financial Institutions, January 1,

1992—December 31, 1992, at 1, 2 (1993) (unpublished report) [hereinafter "Bank Crime Statistics"].[1] By contrast, this case involves four bank robbers, three of whom went into the bank. In the typical bank robbery, the robber is not armed. *See id.* at 1–2, 4.[2] By contrast, in this case, there were three armed robbers in the bank, one of whom had an Uzi. These particular facts take this case outside the heartland of bank robberies and justify an upward departure.

## IV

The second step of our review process under *Weaver* is to determine whether there is a sufficient factual basis for the district court's upward departure. Here, there is, to the extent that the departure was based on there being four robbers and three weapons; the number of robbers and weapons involved are undisputed facts. If the district court had clearly based its upward departure on the multiple robber and weapons facts, and on those facts alone, we would move to the third step of our review process, which is to determine the reasonableness of the amount of the upward departure. That third step of the review process is problematic, however, in a case where the district court relied at least in part on inappropriate factors to support the upward departure. We do not know how many levels the district court would have departed upward if it had confined its consideration to only those two factors we have decided could serve as a basis for an upward departure in this case.

## V

Because the district court departed upward on a number of grounds, some valid and some invalid, it is necessary that we remand this case for resentencing. If on remand the district court departs upward

from the sentencing guidelines, it must confine itself and its departure to the two aspects of this case that we have concluded take it outside the heartland of bank robberies: the number of robbers and the number of weapons involved.

VACATED and REMANDED.

HILL, Senior Circuit Judge, dissenting in part:

I agree with all that is said and held by the panel majority with one exception. I express my view on that one part of the opinion as follows:

The panel affirms the district court's conclusion that this bank robbery was "not an ordinary" one. I disagree. If there is a heartland of typical robbery cases under section 2B3.1, this seems to me to lie within it. The offense was committed by three armed men and a waiting accomplice during banking business hours. The use of a single weapon by each of the three robbers who entered the bank would seem to be standard operating procedure for a bank robbery rather than the weapon use "substantially in excess of that [ ] ordinarily [ ] involved in the offense," U.S.S.G. § 5K2.0, p.s., necessary for a departure. In contrast, *see United States v. Nakagawa*, 924 F.2d 800, 805 (9th Cir. 1991) (enhancement for use of multiple weapons in drug offense warranted where a single defendant's "arsenal of 18 firearms, some fully automatic, elevated the factor of weapon possession in this case to an extraordinary level.")

Similarly, neither Fernandez' behavior toward the assistant manager nor the overall conduct of the robbery were outside the range of typical robbery cases the Commission addressed through section 2B3.1 of the guidelines. Armed bank robbery by defini-

---

1. The report indicates that there were 9,063 robberies of federally insured bank-type institutions in calendar year 1992. Bank Crime Statistics, *supra*, at 1. Another 449 burglaries and larcenies of the same type of institutions were also reported. Thus, the total number of crimes reported against bank-type institutions was 9,512. The report indicates that 11,439 perpetrators were known to be involved in those 9,512 crimes, *id.* at 2, which yields an average of 1.2 known perpetrators per crime.

2. The FBI report contains statistics concerning the number of weapons observed in the 9,063 robberies of federally insured bank-type institutions in 1992. Firearms were used in 3,186 cases; explosive devices were used or threatened in 302 cases; and "other weapons" were used in 101 cases, for a total of 3,589 cases involving some type of weapons. Thus, weapons of some kind were used in only about 40 percent of the robberies of bank-type institutions that occurred in 1992.

tion involves danger to the public and to bank employees, danger that the Sentencing Commission factored into the robbery sentencing structure. For an illustration of excessive or atypical circumstances warranting departure from the guideline sentence, *see United States v. Baker*, 914 F.2d 208, 210 (10th Cir.), *cert. denied*, 498 U.S. 1099, 111 S.Ct. 993, 112 L.Ed.2d 1077 (1991) (upward departure affirmed on appeal where acquisition of dynamite included abduction at gunpoint of supply store owner and where subsequent armed robbery of credit union included brandishing of two firearms and display of briefcase full of dynamite with threat to blow up the building). In the instant case, while the danger to the public and to the bank employees was quite serious, I do not believe it was at an extreme or unusual level for an armed bank robbery. I should conclude that this robbery was not a "rare occurrence," U.S.S.G. Ch. 1, Pt. A, 4(b), warranting an upward departure from the prescribed guideline sentence.

I have no difficulty agreeing with the district judge, and the court, today, that this defendant/appellant was guilty of outrageous conduct which, in a civilized society, is deserving of a sentence which will punish him and deter others from similar unacceptable conduct. Whether or not the Sentencing Guidelines provide such a sentence in cases like this one is a matter for the Sentencing Commission. As stated above, the Commission appears to have taken into consideration the outrageous nature of the offense involved here and has made provision for it in the guidelines.

Because I conclude that the factors relied upon by the district judge for a departure from the base offense level were factors already "adequately consider[ed]" by the guidelines, *Weaver*, 920 F.2d at 1573, I should not undertake the second and third steps of the *Weaver* inquiry. Fernandez' base offense level reflected his earlier offenses, his leadership role in this offense, the type of crime, the target institution, the weapons used, and the loss to the bank. Under these circumstances, departure for the reasons expressed by the district court was inappropriate.

I am not persuaded to the contrary of this view by the bank robbery statistics considered by the majority. Aside from the fact that this material may constitute evidence inappropriately evaluated by the appellate court, it seems to me that the differences between the "typical" bank robbery (if there be such a thing) and this case are merely differences and not real distinctions. These people did what armed bank robbers do.

Perhaps nowhere in the establishment of guideline sentencing was it found that, across the nation, there were disparate sentences any greater than the sentences in armed bank robbery cases. There were regional differences. The region of this circuit probably handed down more stringent custodial sentences for bank robbery than other regions. We are inclined to find that the guideline sentences for armed bank robbery are inadequate. They may be. But they are the guidelines and we are not at liberty to correct them by departure.